# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WHISTLER INVESTMENTS, INC., a
Nevada corporation; SALIM S.
RANA INVESTMENTS CORP., a
corporation; AMERICAN DREAM
HOLDINGS, INC., a corporation,
        *Plaintiffs-Appellants,*

        v.

THE DEPOSITORY TRUST AND
CLEARING CORPORATION; THE
DEPOSITORY TRUST COMPANY; THE
NATIONAL SECURITIES CLEARING
CORPORATION,
        *Defendants-Appellees.*

No. 06-16088

D.C. No.
CV-05-00634-
RCJ/GWF

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert C. Jones, District Judge, Presiding

Argued and Submitted
March 10, 2008—Phoenix, Arizona

Filed August 22, 2008

Before: Michael Daly Hawkins, Sidney R. Thomas, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Thomas

11531

## COUNSEL

Michael J. Morrison, Reno, Nevada, and John R. Knight (argued), Memphis, Tennessee, for the appellants.

Don Nomura and Daniel T. Hayward, Laxalt & Nomura, Reno, Nevada, Gregg M. Mashberg (argued) and Karen D. Coombs, Proskauer Rose LLP, New York, New York, for the appellees.

Scott K. Attaway (argued), Washington, DC, for North American Securities Administrators Association, as amicus curiae in support of the appellants.

Mark R. Pennington (argued), Securities and Exchange Commission, Washington, DC, for Securities and Exchange Commission, as amicus curiae in support of the appellees.

---

## OPINION

THOMAS, Circuit Judge:

This case requires us to consider whether the Securities Exchange Act of 1934 preempts state-law claims against registered clearing agencies in connection with their clearance and settlement services, where those services were performed pursuant to a program approved of by the Securities Exchange Commission. Although we conclude that the state law claims asserted here were not precluded by field preemption, we hold the claims were barred by conflict preemption. We therefore affirm the judgment of the district court.

I

Whistler Investments, Inc., Salim S. Rana Investments Corp., and American Dream Holdings, Inc. (collectively "Whistler") brought an action for damages under Nevada state law against three registered clearing agencies. Whistler Investments is a Nevada corporation whose common stock is publicly traded. Salim S. Rana Investments and American Dream Holdings are shareholders who purchased and sold Whistler common stock in the open market between April 2002 and November 2004.

Whistler alleges that short sellers drove down the market price for Whistler stock by selling Whistler shares without

having stock available for delivery, and then intentionally failing to deliver the stock. Such a technique is referred to as "naked short selling." *See Amendments to Regulation SHO*, Exchange Act Release No. 54,154, 2006 WL 2712000, at *1 (July 14, 2006).

"A short sale is a term of art used for a security trading practice in which a party 'speculates that a particular stock will go down in price and seeks to profit from that drop.' " *Lapidus v. Hecht*, 232 F.3d 679, 680-81 (9th Cir. 2000) (quoting *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 700 (2d Cir. 1998)). The seller sells a security he does not own, borrows the security from a broker to meet the delivery obligation, and then purchases an identical security to return to the broker. If the security has declined in price between the sale and the purchase, the seller profits. *See id.* at 681; 17 C.F.R. § 242.200(a) (defining short sale). In contrast, "a 'naked short sale' occurs when a seller sells a security without owning or borrowing it and does not deliver the security when due." *In re Phylo Corp.*, 2007 WL 966943, 16 Exchange Act Release No. 55,562, at *4 n.22 (March 30, 2007).

Whistler's complaint is premised on its claim that the naked short selling was facilitated by alleged defects in a program operated by the National Securities Clearing Corporation, one of the defendants in this action. Defendants moved to dismiss the action on the ground that federal securities law preempts Whistler's claims. The district court granted Defendants' motion, holding Whistler's claims preempted under the doctrines of field preemption and conflicts preemption. We review de novo a district court's decision regarding preemption. *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 928 (9th Cir. 2003).

## II

Congress added Section 17A to the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78a et seq.,

in 1975 in order to remove impediments to a uniform national system for the prompt and accurate clearance and settlement of securities transactions. *See* 15 U.S.C. § 78q-1(a)(1)(A). Among other provisions, Section 17A provided for the registration of "clearing agencies" by the Securities Exchange Commission ("the Commission"). *See* 15 U.S.C. § 78q-1(b). The role of the clearing agencies was to replace an inefficient and outmoded system of clearing agencies with a more modern and efficient system. *See* 15 U.S.C. § 78q-1(a)(1). Congress directed the Commission to use its authority to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of securities transactions as well as to coordinate or link facilities for such clearance and settlement. *See* 15 U.S.C. § 78q-1(a)(2)(A).

The three defendants in this action are the Depository Trust & Clearing Corporation ("DTCC"), the Depository Trust Company ("DTC") and the National Securities Clearing Corporation ("NSCC"). DTC and NSCC are subsidiaries of DTCC and are registered clearing agencies pursuant to Section 17A. DTC is the nation's principal securities depository. It operates an automated, centralized system for book-entry transfers of securities positions among its participants, the beneficial owners of the securities, in accordance with their instructions. NSCC provides centralized clearance, settlement, and information services for virtually all broker-to-broker equity, corporate bond, municipal bond and other securities transactions in the United States. The changes in beneficial ownership of securities resulting from transactions that are cleared and settled at NSCC are implemented by book-entry transfers among brokers' accounts at DTC.

At times, a seller does not deliver to NSCC's system the securities it has sold by the settlement date. Such an occurrence is called a "fail-to-deliver." In 1981, NSCC created the Stock Borrow Program to deal electronically with temporary, short term fails-to-deliver. NSCC has promulgated rules to govern the operation of the Stock Borrow Program, and the

Commission has approved those rules. *See National Securities Clearing Corp. Proposed Rule Changes by Self-Regulatory Organization*, 45 Fed. Reg. 5867, 5867-68 (Jan. 24, 1980) (notice of filing of NSCC proposed rule change adopting as a one year pilot program procedures for borrowing securities to meet system needs); *National Securities Clearing Corp. Proposed Rule Change*, 46 Fed. Reg. 3104-01, 3104 (Jan. 13, 1981) (notice of filing of NSCC proposed rule change making pilot program permanent); *Depository Trust Co.*, Exchange Act Release No. 20,221, 48 Fed. Reg. 45167-02, 45167-68 (Oct. 3, 1983) (granting NSCC's application for full registration).

The Stock Borrow Program allows NSCC to facilitate the settlement of fail-to-deliver transactions by electronically "borrowing" the requisite number of shares of the undelivered stock from one of its members who is willing to lend the shares, and then delivering the "borrowed" shares to the purchaser.[1] NSCC guarantees the transactions it processes by assuming the obligation of sellers to deliver shares to buyers. The buyer is credited with the shares and never knows that there has been a fail-to-deliver.

Whistler alleges that at times fails-to-deliver are not cured for long periods, which creates more electronic shares in the marketplace than are reflected in the paper share certificates held by DTC. Whistler argues that Defendants are liable under state law because this "defect" in the Stock Borrow Program depressed the value of Whistler stock.

---

[1]To eliminate the movement of paper certificates in settlement of securities transactions, DTC keeps physical custody of virtually all such certificates. Purchase and sale transactions are done, cleared, and settled in book-entry form, based on the actual paper certificates held by DTC. In theory, the electronic universe of securities purchased and sold by DTC's members should more or less match the paper universe of the underlying certificates. The gravamen of Whistler's complaint is that Defendants have manipulated the system, causing artificial inflation of electronic stock, such as Whistler's.

### III

**[1]** Congress has the constitutional power to preempt state law, Art. VI, cl. 2; *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824), and may do so either expressly—through clear statutory language—or implicitly. Defendants acknowledge that Congress has not expressly preempted any of Whistler's claims, but argue that Section 17A of the Securities Act implicitly preempts the claims.

**[2]** There are two types of implied preemption: field preemption and conflict preemption. Under field preemption, preemption is implied when Congress "so thoroughly occupies a legislative field," that it effectively leaves no room for states to regulate conduct in that field. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). Under conflict preemption, Congress's intent to preempt state law is implied to the extent that federal law actually conflicts with any state law. *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). Conflict preemption analysis examines the federal statute as a whole to determine whether a party's compliance with both federal and state requirements is impossible or whether, in light of the federal statute's purpose and intended effects, state law poses an obstacle to the accomplishment of Congress's objectives. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

### A

**[3]** Defendants do not argue that Congress intended to occupy the entire field of securities regulation. Rather, Defendants argue that Section 17A of the Exchange Act reflects Congress's intent to occupy the field of clearing and settling securities transactions. However, an examination of the statutory framework of the Exchange Act does not reveal the comprehensiveness necessary to infer that Congress intended to

wholly occupy even the narrower field of clearing and settling securities transactions to the exclusion of state law.[2]

When Congress enacted the Exchange Act, it included a provision which recognizes that the Act does not impact any non-conflicting state securities laws:

> [T]he rights and remedies provided by [the Exchange Act] shall be in addition to any and all other rights and remedies that may exist at law or in equity . . . . [N]othing in this [Act] shall affect the jurisdiction of the securities commission . . . of any State over any security or any person insofar as it does not conflict with the provisions of this [Act] or the rules and regulations thereunder.

15 U.S.C. § 78bb(a). This provision does not indicate congressional intent to occupy the entire field of securities regulation, but rather, to occupy that field only inasmuch as state laws "conflict with the provisions of [the Act] or the rules and regulations thereunder." *Id.*

[4] With respect to the narrower field of clearing and settling securities transactions, a provision within Section 17A and a subsequent amendment indicate that Congress did not intend to wholly occupy that legislative field either. First,

---

[2]Our analysis is guided in part by a recent decision of the Nevada Supreme Court, which affirmed a trial court's dismissal of a substantively identical complaint against the same defendants, on the ground of conflict preemption. *See Nanopierce Technologies, Inc. v. Depository Trust and Clearing Corp.*, 168 P.3d 73 (Nev. 2007). Although we are of course not bound by that court's conclusions, we find the analysis thorough and sound. As a result, our own analysis proceeds in a similar manner.

We note also that similar complaints against the same defendants have been filed in at least two other jurisdictions, and both have been dismissed on preemption grounds. *See Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 545 F.Supp.2d 845 (E.D. Ark. 2008); *Caprece v. Depository Trust & Clearing Corp.*, 2005 WL 4050118 (S.D. Fla. 2005).

Congress included a provision in Section 17A stating that Section 17A shall not "be construed to impair the authority of any State banking authority or other State . . . regulatory authority having jurisdiction over a person registered as a clearing agency . . . to make and enforce rules . . . which are not inconsistent with [Section 17A] and the rules and regulations thereunder." 15 U.S.C. § 78q-1(d)(4). That provision unambiguously signifies that Congress did not intend to occupy the entire field of national clearance and settlement of securities transactions, as Congress explicitly left room for state banking and regulatory authorities to supplement that legislative field's regulation, so long as any state regulation is not inconsistent with Section 17A.

**[5]** A subsequent amendment also reveals congressional intent to avoid comprehensively regulating the entire national securities clearance and settlement field. Congress amended Section 17A in 1990 to add provisions allowing the Commission to adopt rules inconsistent with state law, but permitting, within two years' time, the states to then enact laws that contradict the Commission's rules:

> Notwithstanding any provision of State law . . . [after making certain findings,] the Commission may adopt rules concerning . . . the transfer of certificated or uncertificated securities . . . or limited interests (including security interests) therein; and . . . [the] rights and obligations of purchasers, sellers, owners, lenders, borrowers, and financial intermediaries (including . . . clearing agencies) involved in or affected by such transfers, and the rights of third parties whose interests in such securities devolve from such transfers.

15 U.S.C. § 78q-1(f)(1).

> Any State may, prior to the expiration of 2 years after the Commission adopts a rule under this sub-

section, enact a statute that specifically refers to this subsection and the specific rule thereunder and establishes, prospectively from the date of enactment of the State statute, a provision that differs from that applicable under the Commission's rule.

15 U.S.C. § 78q-1(f)(3).

**[6]** In light of these two provisions, we hold that Congress explicitly left room for state laws to supplement the federal regulatory scheme and thus did not reveal the necessary "clear and manifest" intent to occupy the field of regulating clearing agencies. *See Bates v. Dow Agrosciences*, 544 U.S. 431, 449 (2005) (internal quotation marks omitted). Accordingly, there is no field preemption and the district court erred in dismissing on that ground.

B

**[7]** Conflict preemption analysis examines the federal statute as a whole to determine whether a party's compliance with both federal and state requirements is impossible or whether, in light of the federal statute's purpose and intended effects, state law poses an obstacle to the accomplishment of Congress's objectives. *Crosby*, 530 U.S. at 373. Thus, our task is to determine whether imposing the requirements implicated by Whistler's state law claims on Defendants is inconsistent with Section 17A's purpose of allowing the Commission to regulate and control a national system for clearing and settling securities transactions. *See* 15 U.S.C. § 78q-1(a)(2)(A) and (B) (directing the Commission to "facilitate the establishment of a national system for the prompt and accurate clearance and settlement" of securities transactions, including registering and regulating clearing agencies). Because the Commission, in accordance with the congressional directive set forth in Section 17A, has approved NSCC's creation of the Stock Borrow Program and the rules it has promulgated to govern Stock Borrow Program operations, we

hold that state-law challenges to the existence or the operation of the Stock Borrow Program are federally preempted because they would conflict with Congressional directive, as set forth under Section 17A.

Whistler's complaint contains twenty-two claims for relief. To analyze each of the claims, we find it useful to divide the claims into two categories: misrepresentation claims and non-misrepresentation claims.

Claims 1-4 and 7-18 of the complaint allege four theories of misrepresentation, each repeated separately to constitute four claims each of misrepresentation, negligent misrepresentation, intentional misrepresentation, and fraudulent misrepresentation.

[8] Whistler's first misrepresentation theory alleges that Defendants misrepresented that NSCC is borrowing shares from lending members of the Stock Borrow Program to cover fail-to-deliver positions when, in fact, the transfer of shares from lending members to NSCC is actually a "sale" of securities. Whistler alleges that the transfer is a sale "because the NSCC delivers the borrowed shares to the buyer who acquires all right, title and interest in the shares." As the complaint itself acknowledges, the description of the Stock Borrow Program as a procedure involving borrowing shares comes from NSCC rules. Thus, Whistler's challenge to NSCC's characterization of Stock Borrow Program procedure is a direct challenge to Commission-approved rules. Such a claim is federally preempted under conflict preemption.

Whistler's second misrepresentation theory alleges that Defendants misrepresented that they efficiently clear and settle trades when, in fact, Defendants are not clearing and settling trades that result in open fail-to-deliver positions. Whistler complains that "sellers routinely fail to deliver securities and that unfulfilled obligations to deliver securities can have negative effects on the market when fails to deliver per-

sist for an extended period of time," and that for this reason the Stock Borrow Program's clearing and settling of securities is not efficient. This claim also constitutes a direct challenge to the operation of the Stock Borrow Program.

Congress enacted Section 17A precisely for the purpose of replacing an inefficient and outmoded system of clearing agencies with a more modern and efficient system. *See* 15 U.S.C. § 78q-1(a)(1). However, Congress did not impose any specific standards of efficiency and instead relied on the Commission to regulate the clearing agencies, *see id.*, which is precisely what the Commission did in approving NSCC's rules and procedures governing the Stock Borrow Program. Imposing any state standard of efficiency would directly interfere with the approved operation of the Stock Borrow Program, and such claims are federally preempted under conflict preemption.

Whistler's third misrepresentation theory alleges that Defendants misrepresented the number of Whistler shares actually held by lending members at DTC by providing misleading information in the lending members' DTC and NSCC account statements. Essentially, Whistler argues that the Stock Borrow Program's method of borrowing shares artificially inflates the number of shares actually held. Once again, this claim amounts to a direct challenge to the Commission-approved operation of the Stock Borrow Program and conflict preemption applies.

Finally, Whistler alleges that Defendants misrepresented that open fail-to-deliver positions will be cured by buying shares in the open marketplace when, in fact, the open positions are actually cured with shares borrowed from lending members through the Stock Borrow Program. The complaint explicitly acknowledges that "[i]nstead of executing the buy-in by going into the market, NSCC executes the buy-in by borrowing shares from lending Members" of the Stock Borrow Program. Thus, Whistler is directly challenging NSCC

rules, which have been approved by the Commission and thus preempt any conflicting state law claim.

Whistler raises six additional claims: market manipulation, in violation of Nev. Rev. Stat. §§ 90.580 and 90.660; violation of Nevada's Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.060; conversion; intentional interference of contractual relations; breach of implied covenant of good faith and fair dealing; and conspiracy. Each of these claims is also federally preempted, under conflict preemption, because each attacks either the existence or the operation of the Stock Borrow Program.

**[9]** Whistler's market manipulation, intentional interference of contractual relations, breach of implied covenant of good faith and fair dealing, and conspiracy claims all reassert the allegation that the Stock Borrow Program's method of borrowing shares artificially inflates the number of shares actually held. These claims amount to a direct challenge to the federally-approved operation of the Stock Borrow Program and are, thus, preempted under conflict preemption.

**[10]** Whistler's unfair trade claim asserts that "Defendants have illegally tied the Stock Borrow Program to the separate and distinct functions of clearing and settling stock trades." However, the Stock Borrow Program was created by NSCC specifically to comply with the congressional directive to "facilitate the establishment of a national system for the prompt and accurate clearance and settlement" of securities transactions, 15 U.S.C. § 78q-1(a)(2)(A)(i). Thus, this claim conflicts with the Commission's approval of the existence and operation of the Stock Borrow Program and is preempted.

**[11]** Finally, Whistler's conversion claim reasserts the theory that Stock Borrow Program security transfers are "sales." As discussed above, the description of the Stock Borrow Program as a procedure involving borrowing shares is derived from NSCC rules. Thus, Whistler's challenge to NSCC's

characterization of Stock Borrow Program procedure is a direct challenge to Commission-approved rules and is also preempted.

## IV

In summary, each of Whistler's 22 claims amount to challenges to the rules and operation of the Stock Borrow Program and, as such, conflict with federal securities law. We thus affirm the district court's dismissal of the complaint on the ground that Whistler's claims are preempted by Section 17A of the Exchange Act, under the doctrine of conflict preemption.

**AFFIRMED.**