# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

No. 08-2114
_____

Pet Quarters, Inc.;                            *
Clyde A. Jester, an individual;                *
Michael Parnell, an individual;                *
Walter D. O'Hearn, Jr., an individual;         *
Demetri Betzios, an individual,                *
                                               *
        Plaintiffs – Appellants,               *
                                               *
        v.                                     *
                                               *  Appeal from the United States
Depository Trust and Clearing                  *  District Court for the Eastern
Corporation; Depository Trust                  *  District of Arkansas.
Company; National Securities                   *
Clearing Corporation,                          *
                                               *
        Defendants – Appellees,                *
                                               *
        ------------------------               *
                                               *
North American Securities                      *
Administrators Association,                    *
Incorporated,                                  *
                                               *
        Amicus on Behalf of Appellant,         *
                                               *
Securities and Exchange Commission,            *
                                               *
        Amicus on Behalf of Appellee.          *

_____

Submitted: January 16, 2009
Filed:   March 9, 2009
_____

Before MURPHY and SMITH, Circuit Judges, and LIMBAUGH[1], District Judge.

_____

MURPHY, Circuit Judge.

Pet Quarters, Inc., a pet supply business, and several of its shareholders (collectively Pet Quarters) filed this damages action in Arkansas state court against Depository Trust and Clearing Corporation and its subsidiaries, Depository Trust Company (DTC) and National Securities Clearance Corporation (NSCC), self regulated organizations registered pursuant to Section 17A amendments to the Securities Exchange Act of 1934 (Section 17A).  15 U.S.C. § 78q-1.  Pet Quarters seeks $400 million in compensatory damages and punitive damages under state law, alleging that a program created and operated by the defendants with the approval of the Securities and Exchange Commission (the Commission) permits "naked short selling" which drove down the market price for its shares and eventually put it out of business.  Defendants removed the case to federal court on the basis of federal preemption, and the district court[2] granted their subsequent motion to dismiss.  Pet Quarters appeals, and we affirm.

I.

Pet Quarters claims it fell victim to a "death spiral" financing scheme by predator investors while it was trying to implement a capital intensive business plan.

_____

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The Honorable Rodney S. Webb, United States District Judge for the District of North Dakota, sitting by designation in the Eastern District of Arkansas.

As a small company it was susceptible to manipulation and control of its share price by investors who allegedly sold its shares "short." A short sale occurs when investors offer to sell shares which they do not own for less than the current trading price. Because there is generally a lag of several days between the trade date and the delivery or settlement date, the seller profits if the share price drops and the seller is able to purchase shares for delivery at a price lower than the amount for which it agreed to sell.

Short sales can be interpreted by investors as an indication that the share price of a stock will decline, and in some cases may actually cause the decline. Successful death spiral investors deliberately push down the share price of a stock through short selling to profit from the decline. Such actions can eventually make the shares worthless.[3] Pet Quarters sued the outside financiers whom it alleges engaged in a death spiral financing scheme against it in a different case now stayed for arbitration, Pet Quarters, Inc. v. Badian, et al., No. 4:04-CV-697 (E.D. Ark.). In the case before our court, Pet Quarters alleges that the Stock Borrow Program (the program) created and operated by the defendants with the approval of the Commission facilitated the death spiral financing scheme which damaged the value of its stock.

DTC and NSCC are wholly owned subsidiaries of the holding company Depository Trust and Clearing Corporation, which in turn is owned by many financial

---

[3]The Commission has recognized that manipulative short selling could pose problems for the markets and has taken steps to restrict or prohibit it in various situations. See Regulation SHO Proposed Release, SEC Rel. No. 34-48709, 68 Fed. Reg. 62972, 62975-78 (Nov. 6, 2003); Short Sales, SEC Rel. No. 34-50103, 69 Fed. Reg. 48008, 48009 (Aug. 6, 2004); Amendments to Regulation SHO, SEC Rel. No. 34-56212, 72 Fed. Reg. 45544 (Aug. 7, 2007); Emergency Order, SEC Rel. No. 34-58166 (July 15, 2008). These public statements restrict the actions of market participants and do not affect the operation of the clearing agencies, suggesting that the Commission believes manipulative short selling is a marketplace issue rather than a clearing agency issue.

industry entities including the New York Stock Exchange. DTC and NSCC serve distinct functions, but together they provide more securities settlement and clearing services than any other entity in the world.

Until 1975 stock sales involved delivery of the physical stock certificates to the buyer, typically through a web of brokers and dealers. As trading volumes increased and systems for clearing and settling stock transactions multiplied, physical transfer of stock certificates became impractical. In 1975 Congress added Section 17A to the Securities Exchange Act of 1934, which directed the Commission "to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities," and to eliminate the physical movement of securities certificates among brokers and dealers. 15 U.S.C. §§ 78q-1(a)(2)(A)(i), (e). Under the new system securities may be held directly through possession of a stock certificate or entry on the issuer's stock registry or indirectly by acquisition of a "security entitlement" from an intermediary such as a clearing company, bank, or broker dealer. UCC § 8-101. A security entitlement is a property interest entitling the holder to exercise all of the rights attached to the security. See UCC § 8-501(b), cmt. 1.

Section 17A also authorized the Commission to register and regulate clearing agencies. Two of the agencies registered and regulated by the Commission under this authority are defendants DTC and NSCC. DTC is the nation's principal securities depository; its nominee Cede & Co. is the direct holder of stock certificates for all of its members which include most securities brokers and dealers in the country and NSCC. DTC's automated system tracks transfers of indirect security entitlement positions among its members, eliminating the need to transfer the physical stock certificates.

NSCC provides centralized clearance, settlement, and information services for virtually all securities transactions in the United States. When a security's ownership

changes hands, NSCC acts as the intermediary between buyer and seller. It verifies the transaction information and assumes the rights and obligations of buyers and sellers to receive, pay for, and deliver securities. NSCC Rules & Procedures, Rule 11 §§ 1(b)-(c),(e), Procedure VII(A). NSCC clears the trades through its continuous net settlement system, which nets each member's purchases and sales of a given security at the end of each day. For example, the NSCC account for a member who purchased 800 shares and sold 1800 shares of Pet Quarters in one day would reflect a net obligation to deliver 1000 Pet Quarters shares to NSCC. NSCC Rules & Procedures, Procedure VII(c)(1).

At the close of business on the settlement date, typically three days after the trade date, NSCC instructs DTC to deliver securities from the selling member's DTC account to NSCC's account to satisfy the obligation. On that same date, NSCC instructs DTC to deliver securities from its account to the accounts of those members who made net purchases of a security on a given trade date and therefore have the right to receive security entitlements from NSCC. See NSCC Rules & Procedures, Rule 11 §§ 3-4.

In theory these transactions should be completed in one day, but sometimes a member "fails to deliver" shares of a security to NSCC because it does not have the shares in its DTC account. There can be several reasons for this failure, including administrative problems or uncovered "naked short sales." In a "covered short sale," the seller offers to sell a security he does not own but arranges to borrow the security from a broker to meet his potential delivery obligation. If someone buys the offered shares, the seller delivers the borrowed shares to the buyer and then purchases shares in the same entity to return to the broker within the agreed time period. In a naked short sale, however, the seller offers to sell a security which he does not own and has not arranged to borrow. In some cases the seller will not deliver the security by the settlement date; this failure to deliver leaves the seller with an open position.

Before 1981, a buyer who was the victim of a failure to deliver could wait for the seller to cure the failure through delivery, or could buy the stock on the open market and charge the seller for the difference between the agreed price and the price the buyer paid in the market. NSCC created the automated Stock Borrow Program in 1981 to cover such failures to deliver. Under this program the seller can electronically borrow the number of shares of undelivered stock from other members' accounts and deliver the borrowed shares to the purchaser. The rules governing the program were developed by NSCC and approved by the Commission under its Section 17A authority.

According to the Stock Borrow Program rules, a member who wishes to participate in the program notifies NSCC daily which securities it has on deposit at DTC that it is making available to the program. If a seller fails to deliver shares of a security by the settlement date, NSCC's account will not have enough shares to meet all of its delivery obligations. In that situation, the program automatically borrows shares from loaning members and covers the sale without the buyer ever knowing that a failure to deliver has occurred. The DTC system records a book entry increasing the buyer's security entitlement position, and the buyer receives all voting and trading rights as with a normal purchase.

Pet Quarters alleges that the Stock Borrow Program created "phantom shares" which diluted the value of its stock because the shares were credited to the buyer's account without being debited from the loaning member's account. According to the program rules, however, the loaning member's account restricts the borrowed shares, and the lending member may not sell or relend the shares until they are returned. NSCC Rules add. C(4). The borrowed shares are returned to the loaning member automatically when there is a net daily gain in deliveries of the stock to NSCC, i.e., when more shares of the borrowed stock are delivered to NSCC than are purchased in one day. This typically occurs when a member cures an open position by buying the shares in the marketplace.

If loaning members have not made enough shares available to the program to cover all failures to deliver in a day, the buyer will be notified. Then the buyer may wait for the seller to cure the failure, ask NSCC to cure the failure, or cure the failure itself by buying shares on the open market and charging the seller for any difference between the agreed upon purchase price and the actual purchase price.

## II.

Pet Quarters's complaint includes sixteen state law claims. After the case was removed, the federal district court concluded that the complaint presented substantial federal questions and dismissed it with prejudice, concluding that any attempt to amend would be futile. The court concluded that Claims 9 through 16, including market manipulation, illegal tying, conversion and conspiracy, were preempted because they amounted to direct, facial attacks on the operation of the Commission approved program and that Claims 1 through 8, alleging various misrepresentations, were preempted because they attacked elements of that program.

## A.

Pet Quarters appeals the district court's decision not to remand the case to state court. We review de novo a district court's exercise of removal jurisdiction and its denial of a motion to remand. Motion Control Corp. v. SICK, Inc., 354 F.3d 702, 704-05 (8th Cir. 2003). A timely notice of removal must be filed within 30 days of the date of service of the complaint and contain "a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a)-(b).

Pet Quarters first claims procedural error, arguing that the defendants' notice of removal did not properly invoke removal jurisdiction because it did not correctly identify the grounds for removal. Several types of actions are removable, including those over which "the [federal] district courts have original jurisdiction founded on

a claim or right arising under the Constitution, treaties, or laws of the United States." 28 U.S.C. § 1441(b). The defendants' notice of removal alleges that because Pet Quarters's complaint "seeks to challenge, on its face, a program that has been expressly approved by the SEC" under authority granted to it in 15 U.S.C. § 78q-1 (Section 17A), the federal courts would have had original jurisdiction over the case and it should be removed pursuant to § 1441.

Pet Quarters claims that the defendants' notice of removal was deficient because the notice asserted that Section 17A completely preempts state law regulation in the area covered by the complaint rather than simply stating that the complaint presented a substantial federal question, the basis for the district court's conclusion that removal jurisdiction existed. A defendant generally is required to cite the proper statutory basis for removal and to allege facts from which a district court may determine whether removal jurisdiction exists. Failure to cite the proper statutory basis for removal is not fatal in every case, however. See, e.g., Wiles v. Capitol Indem. Corp., 280 F.3d 868, 871 (8th Cir. 2002) (failure to cite § 1441 as grounds for removal did not deprive court of removal jurisdiction because § 1441 jurisdictional requirements were met). In this case the defendants cited § 1441, the proper statutory basis for removal, and alleged facts from which the district court could determine that removal was appropriate. The district court did not commit procedural error in denying the motion to remand.

As to the merits of removal, Pet Quarters claims that its complaint presents no substantial federal question justifying removal. Federal question jurisdiction is available only where (1) the right to relief under state law depends on the resolution of a substantial, disputed federal question, and (2) the exercise of jurisdiction will not disrupt the balance between federal and state jurisdiction adopted by Congress. See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313-14 (2005).

Removal based on federal question jurisdiction is governed by the well pleaded complaint rule: jurisdiction is established only if a federal question is presented on the face of the plaintiff's properly pleaded complaint. Phipps v. FDIC, 417 F.3d 1006, 1010 (8th Cir. 2005). Federal jurisdiction may be found from a complaint if adjudication of a state claim would turn on a federal constitutional or other important federal question, even where only state law issues have been pled. See Merrell Dow Pharms. Inc. v. Thompson, 478 U.S. 804, 808-09 (1986). If even one claim in the complaint involves a substantial federal question, the entire matter may be removed. See Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 9 (2003).

Pet Quarters alleges that its state law claims do not depend on resolution of any federal question. It argues that federal law is implicated only as part of the defendants' preemption defense, which is not a proper basis for removal. See Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 14 (1983). But Claim 12 of Pet Quarters's complaint, for example, states that "The Stock Borrow Program, *by its mere existence*, hinders competition. *The Stock Borrow Program* is anticompetitive. . . ." (Emphasis added.) Claim 12 presents a substantial federal question because it directly implicates actions taken by the Commission in approving the creation of the Stock Borrow Program and the rules governing it. Resolution of this dispute would control the outcome in numerous other cases. See Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 700 (2006); see also Franchise Tax Bd., 436 U.S. at 14 (plaintiff's claim preempted where relief would require construction of federal law or adjudication of its preemptive effect and constitutionality). We conclude that the claims in Pet Quarters's complaint including Claim 12 present substantial federal questions and that the district court did not err by permitting removal of the matter to federal court or by denying its motion for remand.

B.

Pet Quarters next argues that the district court erred by dismissing its state law misrepresentation claims, Claims 1 through 8, because they do not attack the Commission approved program itself, but rather the way in which the defendants represent program operations to the public. Appellant does not appeal dismissal of Claims 9 through 16 which the district court concluded amounted to direct facial attacks on the program itself. Pet Quarters contends that Claims 1 through 8 could succeed without challenging the existence or operations of the Commission approved program or its rules. Appellees counter that each misrepresentation cause of action amounts to an attack on some Commission approved aspect of the program. They point out that two cases in other courts involving the same plaintiff lawyers, the same defendants, and complaints which employ the same theories as this case have been dismissed on the basis of conflict preemption. Whistler Invests., Inc. v. Depository Trust & Clearing Corp., 539 F.3d 1159 (9th Cir. 2008); Nanopierce Tech., Inc. v. Depository Trust & Clearing Corp., 168 P.3d 73 (Nev. 2007), cert. denied, 128 S. Ct. 2428 (2008). We review de novo the district court's dismissal of the complaint on grounds of preemption, accepting as true the plaintiff's factual allegations and granting all reasonable inferences in favor of the plaintiff. Phipps, 417 F.3d at 1010.

The Supremacy Clause provides Congress the authority expressly to preempt state law by defining the scope of preemption, or impliedly where congressional intent to supersede state law may be inferred. See U.S. Const. art. VI, cl. 2; Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 58 U.S. 141, 152-53 (1982). Implied preemption exists where a federal statutory or regulatory scheme is so pervasive in scope that it occupies the field, leaving no room for state action—this is termed field preemption. See id. at 153. Implied preemption also occurs where state law has not been completely displaced but is superseded to the extent that it conflicts with federal law—this is known as conflict preemption. Id. The district court concluded that in this case

conflict preemption applies because Section 17A conflicts with and therefore preempts each of Pet Quarters's state law claims.

Conflict preemption exists where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives. Whistler, 539 F.3d at 1166; see De la Cuesta, 58 U.S. at 153 (federal regulations have no less preemptive effect than federal statutes). Through Section 17A Congress directed the Commission to facilitate the establishment of a prompt, accurate national clearance and settlement system to protect investors and the public interest. The Commission carried out this congressional directive when it approved NSCC's creation of the Stock Borrow Program and the rules governing the program's operations. To the extent that any of Pet Quarters's state law claims challenge the program or its rules, a favorable ruling on them would necessarily conflict with Commission regulation and control of the national securities clearing and settlement system and pose an obstacle to the congressional objectives in Section 17A. Accordingly, any of Pet Quarters's state law claims that challenge the existence or operation of the program or its rules are federally preempted. See Whistler, 539 F.3d at 1166; Credit Suisse First Boston Corp. v. Grunwald, 400 F.3d 1119, 1128 (9th Cir. 2005) ("self regulated organization rules approved by the Commission preempt conflicting state law"); see also Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 31 (1996) (conflict preemption applies where state law forbids conduct that federal law authorizes). The district court concluded that each of Pet Quarters's claims challenged some aspect of the Commission approved Stock Borrow Program operations or rules and was preempted.

In Claims 1 and 5 Pet Quarters alleges that the defendants represent that under the program shares are borrowed from loaning members when they are actually bought and sold because NSCC delivers the borrowed shares to the buyer. Acting under its Section 17A authority the Commission approved the Stock Borrow Program and its rules which characterize the transactions as involving loaning and borrowing,

not selling and purchasing. A state court finding that a transaction within the program is a sale rather than a loan would conflict directly with the Commission approved rules, and the district court did not err in concluding that Pet Quarters's claims seeking that result are preempted. See Whistler, 539 F.3d at 1166; Nanopierce, 168 P.3d at 83.

In Claims 2 and 6 Pet Quarters alleges that the defendants represent that "they efficiently clear and settle trades" when in fact the program does not efficiently clear and settle trades because it allows failures to deliver to remain open for extended periods. One of the Commission approved program rules states, "In order to *improve the efficiency* of the clearing system in dealing with [open positions], the [NSCC] Board has authorized the implementation of [the Stock Borrow Program]." (Emphasis added.) We conclude the district court did not err in deciding that these claims are preempted because they seek a determination from a state factfinder that a program declared efficient in rules approved under federal law was in fact not. See also Whistler, 539 F.3d at 1166 (same claims preempted because imposing state standard of efficiency would interfere directly with Commission approved operation of program).

In Claims 3 and 7 Pet Quarters alleges that the defendants misrepresent the number of its shares that a lending member has on account with DTC and NSCC after it loans shares to the program because that number is not reduced, inflating the total number of shares actually held (its phantom shares argument). The methods of accounting for loaned shares are described in detail in the Commission approved program rules, NSCC Rules add. C(4). Footnote 9 of Pet Quarters's complaint describes those methods the same way, and Pet Quarters does not allege that the defendants accounted for loaned shares differently than directed under the rules. Pet Quarters's claim that the accounting methods create phantom shares is nothing more than a complaint about the Commission approved accounting methods. The district

court did not err in concluding that these claims were preempted because they amount to a direct challenge to the operation of the Commission approved program.

In Claims 4 and 8 Pet Quarters alleges that when a seller fails to deliver shares to a buyer, NSCC rules allow the buyer to notify NSCC of its intent to cure the failure by buying shares on the open market, but that despite the rules NSCC denies the buyer that opportunity by curing failures with shares borrowed through the program. Pet Quarters claims that this amounts to a misrepresentation because buyers are actually not allowed to initiate buy in procedures. Pet Quarters simply misreads the rules. Under the Commission approved NSCC rules, a failure to deliver is cured through the Stock Borrow Program if there are enough shares available from lending members to credit the buyer's account and cover the seller's failure to deliver. When this happens the buyer is never aware of the failure and would have no need to initiate buy in procedures because the shares are credited to its account as normal. If, however, there are not enough shares available from lending members to credit the buyer's account, the buyer will know that there has been a failure to deliver and may initiate buy in procedures at that point. These claims by Pet Quarters would succeed only if a state court found that the Commission approved rules were invalid; accordingly, the district court did not err in concluding that they are preempted.

In short, all of the damages that Pet Quarters claims to have suffered stem from activities performed or statements made by the defendants in conformity with the program's Commission approved rules. A favorable ruling on any of them would conflict with the Commission's control of the national securities clearing and settlement system and pose an obstacle to the congressional objectives in Section 17A. We conclude that the district court did not err in dismissing the complaint on the basis of preemption.

## C.

Pet Quarters claims in the alternative that the district court erred in dismissing its complaint with prejudice rather than allowing it to file a first amended complaint to refine its claims. It contends that it should have been allowed to amend its complaint as a matter of right because the defendants had not yet filed an answer or that the district court abused its discretion by not allowing it to amend. The defendants respond that granting leave to amend would have been inappropriate because Pet Quarters never submitted a proposed amended complaint, nor did it indicate to the court what it would add to its complaint to make it viable.

Leave to amend a complaint "shall be given freely when justice so requires." Fed. R. Civ. P. 15(a). Leave to amend generally is inappropriate, however, where the plaintiff has not indicated how it would make the complaint viable, either by submitting a proposed amendment or indicating somewhere in its court filings what an amended complaint would have contained. Wolgin v. Simon, 722 F.2d 389, 394-95 (8th Cir. 1983). The record does not indicate that Pet Quarters has ever submitted a proposed amended complaint or clarified what one might have contained. The district court did not err or abuse its discretion in concluding that amendment would be futile and in dismissing with prejudice.

## III.

For these reasons we affirm the judgment of the district court.

_____