# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 09-2762

_____

| | | |
|---|---|---|
| In re: Aurora Dairy Corp.<br>Organic Milk Marketing and<br>Sales Practices Litigation<br><br>_____ | * <br> * <br> * <br> * <br> * | |
| Kristine Mothershead, individually<br>and on behalf of all others similarly<br>situated; Leonie Lloyd, individually<br>and on behalf of all others similarly<br>situated, | * <br> * <br> * <br> * <br> * <br> * | |
| Appellants, | * <br> * | |
| v. | * <br> * <br> * | Appeal from the United States<br>District Court for the<br>Eastern District of Missouri. |
| Aurora Organic Dairy, doing business<br>as Aurora Organic Dairy;<br>Quality Assurance International, Inc.;<br>Case Vander Eyk, Jr., doing business<br>as Case Vander Eyk, Jr. Dairy;<br>Publix Super Markets, Inc., | * <br> * <br> * <br> * <br> * <br> * | |
| Appellees,<br><br>_____ | * <br> * <br> * | |
| Robert Edward Koch, individually and<br>on behalf of those similarly situated, | * <br> * <br> * | |
| Appellant, | * <br> * | |
| v. | * <br> * | |

Aurora Dairy Corporation;     *
Quality Assurance International, Inc.;     *
Case Vander Eyk, Jr., doing business     *
as Case Vander Eyk, Jr. Dairy;     *
Publix Super Markets, Inc.,     *
    *
       Appellees,     *
_____     *
    *
Maya Fiallos, individually and on     *
behalf of all others similarly situated,     *
    *
       Appellant,     *
    *
      v.     *
    *
Aurora Dairy Corporation, doing     *
business as Aurora Organic Dairy;     *
Quality Assurance International, Inc.;     *
Case Vander Eyk, Jr., doing business     *
as Case Vander Eyk, Jr. Dairy;     *
Publix Super Markets, Inc.,     *
    *
       Appellees,     *
_____     *
    *
Rebecca Freyre, on behalf of herself     *
and all others similarly situated;     *
Fernanado Freyre, on behalf of himself     *
and all others similarly situated,     *
    *
       Appellants,     *
    *
      v.     *
    *

Aurora Dairy Corporation;　　　　　*
Quality Assurance International, Inc.;　*
Case Vander Eyk, Jr., doing business　*
as Case Vander Eyk, Jr. Dairy;　　　*
Publix Super Markets, Inc.,　　　　*
　　　　　　　　　　　　　　　*
　　　　　Appellees,　　　　　　*
　　　　　　　　　　　　　　　*
_____　　　　*
　　　　　　　　　　　　　　　*
Mona Still; Helen Phillips; Eve Hana;　*
Jeanmarie Zirger; Kim King; Noelle　*
Fincham; Oksana Jensen; Gabriela　*
Waschewsky; Laurelanne Davis;　　*
Debbie Millikan; Joan Scheutz;　　　*
Sandie Regan; Steve Shriver; Mary　*
Elbertai; Eileen Ptak; Cynthia　　　*
Roche-Cotter; Kristen Finnegan; Amy　*
Forsman; Joy Beckner; Naomi　　　*
Mardock; Olive Knaus; Liana Hoodes;　*
Donita Robinson; Ilene Rachford;　　*
Lisa Hopkins; Caryn Poirier; Erin　*
Diserens; Tammy Coselli; Debra　　*
Haines; Debra Schmidt; Hans Kueck,　*
　　　　　　　　　　　　　　　*
　　　　　Appellants,　　　　　*
　　　　　　　　　　　　　　　*
　　　　v.　　　　　　　　　*
　　　　　　　　　　　　　　　*
Aurora Dairy Corporation, doing　　*
business as Aurora Organic Dairy;　*
Quality Assurance International, Inc.;　*
Case Vander Eyk, Jr., doing business　*
as Case Vander Eyk, Jr. Dairy;　　　*
Publix Super Markets, Inc.,　　　　*
　　　　　　　　　　　　　　　*
　　　　　Appellees,　　　　　　*
　　　　　　　　　　　　　　　*
_____　　　　*

Ilsa Lee Kaye, individually and on behalf of all others similarly situated,

Appellant,

v.

Aurora Dairy Corp., doing business as Aurora Organic Dairy; Quality Assurance International, Inc.; Case Vander Eyk, Jr., doing business as Case Vander Eyk, Jr. Dairy; Publix Super Markets, Inc.,

Appellees,

_____

Patrick Hudspeth, individually and on behalf of a class of all others similarly situated; Caryn Hudspeth, individually and on behalf of a class of all others similarly situated,

Appellants,

v.

Target Corp.; Quality Assurance International, Inc.; Case Vander Eyk, Jr., doing business as Case Vander Eyk, Jr. Dairy; Publix Super Markets, Inc.,

Appellees,

_____

Paul Bowen, individually and on      *
behalf of all others similarly situated,      *
     *
         Appellant,      *
     *
      v.      *
     *
Wal-Mart Stores, Inc.; Quality      *
Assurance International, Inc.; Case      *
Vander Eyk, Jr., doing business as      *
Case Vander Eyk, Jr. Dairy; Publix      *
Super Markets, Inc.,      *
     *
         Appellees,      *
_____      *
     *
Elizabeth Cockrell, individually and      *
on behalf of a class of all others      *
similarly situated,      *
     *
         Appellant,      *
     *
      v.      *
     *
Aurora Dairy Corporation, doing      *
business as Aurora Organic Dairy;      *
Quality Assurance International, Inc.;      *
Case Vander Eyk, Jr., doing business      *
as Case Vander Eyk, Jr. Dairy;      *
Publix Super Markets, Inc.,      *
     *
         Appellees,      *
_____      *
     *
Jim Snell; Steve Clark; John Barrera;      *
Joseph Villari; Elida Gollomp;      *
Claire M. Theodore; Elizabeth Banse,      *

on behalf of themselves and all others similarly situated,                    *
                                                                              *
                                                                              *
        Appellants,                    *
                                                                              *
    v.                                                     *
                                                                              *
Aurora Dairy Corporation, doing business as Aurora Organic Dairy; Wild Oats Market, Inc.; Costco Wholesale Corporation; Safeway, Inc.; Wal-Mart Stores, Inc.; Quality Assurance International, Inc.; Case Vander Eyk, Jr., doing business as Case Vander Eyk, Jr. Dairy; Publix Super Markets, Inc.; Whole Foods Market Group, Inc.,                    *
                                                                              *
                                                                              *
                                                                              *
                                                                              *
                                                                              *
                                                                              *
                                                                              *
                                                                              *
                                                                              *
        Appellees,                    *
_____                                                      *
                                                                              *
Vicki M. Tysseling-Mattiace, individually and on behalf of a class of all other similarly situated,                    *
                                                                              *
                                                                              *
        Appellant,                    *
                                                                              *
    v.                                                     *
                                                                              *
Wild Oats Market, Inc.; Quality Assurance International, Inc.; Case Vander Eyk, Jr., doing business as Case Vander Eyk, Jr. Dairy; Publix Super Markets, Inc.; Whole Foods Market Group, Inc.,                    *
                                                                              *
                                                                              *
                                                                              *
                                                                              *
                                                                              *
        Appellees,                    *

_____                              *

                                                                        *

Margot A. West, individually and                                        *
on behalf of a class of all others                                      *
similarly situated; Richard E. Ehly,                                    *
individually and on behalf of a class                                   *
of all others similarly situated,                                       *

                                                                        *

        Appellants,                *

                                                                        *

    v.                                                 *

                                                                        *

Aurora Dairy Corporation, doing                                         *
business as Aurora Organic Dairy;                                       *
Quality Assurance International, Inc.;                                   *
Case Vander Eyk, Jr., doing business                                    *
as Case Vander Eyk, Jr. Dairy;                                          *
Publix Super Markets, Inc.,                                             *

                                                                        *

        Appellees,                 *

_____                              *

                                                                        *

Channing Hesse, individually and                                        *
on behalf of a class of all others                                      *
similarly situated,                                                     *

                                                                        *

        Appellant,                 *

                                                                        *

    v.                                                 *

                                                                        *

Costco Wholesale Corporation, a                                         *
Washington corporation; Quality                                         *
Assurance International, Inc.; Case                                      *
Vander Eyk, Jr., doing business as                                      *

Case Vander Eyk, Jr. Dairy; Publix     *
Super Markets, Inc.,     *
    *
         Appellees,     *
_____     *
    *
Hillary White, individually and     *
on behalf of all others similarly     *
situated; Lynn Michalson, individually     *
and on behalf of all others similarly     *
situated,     *
    *
         Appellants,     *
    *
         v.     *
    *
Aurora Dairy Corp., doing business     *
as Aurora Organic Dairy; Publix     *
Super Markets, Inc.,     *
    *
         Appellee,     *
_____     *
    *
Fayetta Cowan,     *
    *
         Appellant,     *
    *
         v.     *
    *
Aurora Dairy Corporation, doing     *
business as Aurora Organic Dairy;     *
Wal-Mart Stores, Inc.; Publix     *
Super Markets, Inc.,     *
    *
         Appellees,     *
_____     *
    *

Nicolle DiSimone, individually and            *
on behalf those similarly situated,           *
                                              *
              Appellant,                      *
                                              *
      v.                                      *
                                              *
Aurora Dairy Corporation, doing               *
business as Aurora Organic Dairy;             *
Case Vander Eyk, Jr., doing business          *
as Case Vander Eyk, Jr. Dairy;                *
QAI, Inc., doing business as Quality          *
Assurance International, Inc.;                 *
Does, 1-100, inclusive; Publix Super          *
Markets, Inc.,                                *
                                              *
              Appellees,                      *
_____                        *
                                              *
Brenda Gallardo,                              *
                                              *
              Appellant,                      *
                                              *
      v.                                      *
                                              *
Aurora Dairy Corporation, a Delaware          *
Corporation, doing business as Aurora         *
Organic Dairy,                                *
                                              *
              Appellee,                       *
_____                        *
                                              *
Shawn Riley, individually and                 *
on behalf all others similarly situated,      *
                                              *
              Appellant,                      *
                                              *

v.                                  *
                                    *
Safeway, Inc.,                      *
                                    *
          Appellee,                 *
_____                 *
                                    *
Theadora King, individually and on  *
behalf of all others similarly situated,  *
                                    *
          Appellant,                *
                                    *
v.                                  *
                                    *
Safeway, Inc.,                      *
                                    *
          Appellee.                 *
_____                 *
                                    *
Public Citizen, Inc.; The Center for  *
Food Safety and Organic Consumers   *
Association; The Humane Society of  *
the United States,                  *
                                    *
          Amici on behalf of        *
          Appellants,               *
_____                 *
                                    *
The Organic Trade Association;      *
Grocery Manufacturers Association,  *
                                    *
          Amici on behalf of        *
          Appellees.                *

                        _____

               Submitted: February 9, 2010
                  Filed: September 15, 2010

-10-

_____

Before RILEY, Chief Judge,[1] SMITH and SHEPHERD, Circuit Judges.
_____

RILEY, Chief Judge.

In this appeal we are called upon to determine whether, and to what extent, the Organic Foods Production Act of 1990 (OFPA), 7 U.S.C. § 6501 et seq., preempts state consumer protection law. The OFPA establishes national standards for the sale and labeling of organically produced agricultural products, and creates a certification program through which agricultural producers may become certified to produce organic products. The OFPA also provides for the accreditation of certification agents, who inspect producers and make recommendations to the United States Department of Agriculture (USDA) regarding certification. Pursuant to the OFPA, the USDA promulgated regulations, known as the National Organic Program (NOP), 7 C.F.R. pt. 205, defining which agricultural products qualify as organic.

One certifying agent, QAI, Inc. (QAI), certified Aurora Dairy Corporation's (Aurora) dairy farm to produce organic milk. Aurora's certified organic milk was later sold to consumers at retail stores owned by Costco Wholesale Corporation (Costco), Safeway Inc. (Safeway), Target Corporation (Target), Wal-Mart Stores, Inc. (Wal-Mart), and Wild Oats Markets, Inc. (Wild Oats) (collectively, the retailers), under the retailers' store brands or Aurora's "High Meadow" brand.

Various plaintiffs (collectively, class plaintiffs) brought nineteen class action lawsuits on behalf of organic milk consumers against Aurora, the retailers, and QAI (collectively, appellees) in federal district courts throughout the nation, claiming

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

-11-

violations of state law arising from Aurora's alleged failure to comply with the OFPA and NOP. The United States Judicial Panel on Multi-District Litigation (JPMDL) consolidated these cases in the Eastern District of Missouri. The district court granted appellees' motions to dismiss, finding the OFPA preempted all of the class plaintiffs' claims, and this appeal followed. We affirm in part and reverse in part.

## I.  BACKGROUND

Dissatisfied with the patchwork of state regulation governing organic products that existed in the 1980s, Congress enacted the OFPA in order "(1) to establish national standards governing the marketing of certain agricultural products as organically produced products; (2) to assure consumers that organically produced products meet a consistent standard; and (3) to facilitate interstate commerce in fresh and processed food that is organically produced." 7 U.S.C. § 6501 (emphasis omitted). Congress intended the OFPA would establish a uniform standard "so that farmers know the rules, so that consumers are sure to get what they pay for, and so that national and international trade in organic foods may prosper." S. Rep. 101-357 (1990) (reprinted in 1990 U.S.C.C.A.N. 4656, 4943).

The OFPA provides that "a person may sell or label an agricultural product as organically produced only if such product is produced and handled in accordance with" the OFPA. 7 U.S.C. § 6505(a)(1)(A). The OFPA creates a certification program, requiring producers of agricultural products marketing their products as "100 percent organic," "organic," or "made with organic" ingredients (collectively, OFPA Terms) to be certified by the USDA or pay a civil penalty of up to $10,000. See §§ 6505(a)(2); 6519(a); 7 C.F.R. §§ 205.303, 205.304. The OFPA authorized the USDA to propose regulations implementing Congress's plan, see 7 U.S.C. § 6521(a), and the USDA ultimately adopted the NOP, a detailed set of implementing regulations, see 7 C.F.R. §§ 205.1-205.699.

The OFPA contemplates the accreditation of certifying agencies to review applications for certification and to determine whether individual applicants qualify for organic certification under the OFPA and NOP. See 7 U.S.C. § 6513; 7 C.F.R. §§ 205.400-205.406. The NOP creates a process for accrediting certifying agents. See 7 C.F.R. §§ 205.500-205-510. QAI is one such accredited certifying agent.

Since 2003, Aurora has continuously held certifications from either QAI or the Colorado Department of Agriculture (CDA) for the agricultural operations at issue in this case. Aurora is a large dairy which operates several farms and a milk processing plant. Each of Aurora's facilities is operated according to an Organic System Plan (OSP), which is "[a] plan of management of an organic production or handling operation that has been agreed to by the producer or handler and the certifying agent and that includes written plans concerning all aspects of agricultural production or handling" in the OFPA and NOP for the particular facility. 7 C.F.R. § 205.2. Aurora's certification has never been suspended or revoked. Aurora sells milk through various retail stores under its High Meadow brand, or supports private labels for the retailers.

The term "private label," sometimes known as "private brand," refers to store brands. These are brands sponsored by a wholesaler, retailer, dealer, or merchant (usually a large one), as distinguished from a brand bearing the name of the manufacturer or producer. Private label products are typically priced lower than major brands at retail and may or may not consistently come from the same source. Typically, although not invariably, the manufacturer furnishes all packaging for retail sale and affixes the private label to the product for the volume purchaser. The retailers purchased milk from Aurora and sold it under their private labels or under Aurora's previously mentioned High Meadow brand.

In April 2007, the USDA proposed revoking Aurora's organic certification. The notice stated the USDA "identified willful violations of [the OFPA] and the regulations

-13-

thereunder." An attachment to the notice detailed fourteen alleged violations by Aurora, including multiple cases of using nonorganic cows to produce organic milk, allegations Aurora willfully "sold, labeled and represented milk as organically produced, when such milk was not produced and handled in accordance with the [NOP] . . . regulations," failed to notify its certifying agent it had terminated its contract with a pasture and livestock management services provider, and failed to report and keep records in accord with the OFPA and NOP.

In August 2007, Aurora and the USDA entered into a consent agreement addressing the concerns raised in the revocation proposal and terminating the agency action. In the consent agreement, Aurora agreed to retire and remove some of its allegedly nonorganic cows, ensure all animals in one of its organic milking herds were under continuous organic management from the last third of gestation, reduce the size of its herds and ensure daily access to pasture in the growing season, remove the certification of its Woodward facility in Greeley, Colorado, address all other issues raised in the notice in its amended organic systems plans, and submit to further review the next year.

Various plaintiffs filed sundry class action lawsuits against Aurora in federal district courts around the country. The first such action was filed in the Eastern District of Missouri. The plaintiffs in one of the actions petitioned the JPMDL, pursuant to 28 U.S.C. § 1407, for centralization of the cases against Aurora in the United States District Court for the District of Colorado. Aurora opposed centralization.

The JPMDL found centralization of the cases would "eliminate duplicative discovery; prevent inconsistent pretrial rulings (particularly with respect to the issue of class certification); and conserve the resources of the parties, their counsel and the judiciary." The JPMDL then found the Eastern District of Missouri was an appropriate forum for the litigation because of its relative convenience given the geographic

-14-

dispersal of the initial actions before the panel and "potential tag-along actions." Nineteen class action cases were transferred to the Eastern District of Missouri for disposition.

After a scheduling conference, the district court entered several housekeeping orders, including an order that the class plaintiffs file a consolidated complaint within 30 days of appointing lead counsel. The class plaintiffs filed their Consolidated Class Action Complaint (CCC) on July 18, 2008.

The CCC alleges numerous facts regarding each of the appellees' private labels. The class plaintiffs allege the milk cartons of Aurora's "High Meadow" brand, Costco's "Kirkland" brand, Safeway's "O Organics" brand, Target's "Archer Farms" brand, Wal-Mart's "Great Value" brand, and Wild Oats's store brand all market the milk they contain as organic when in fact it is not.

The class plaintiffs also allege that Aurora and each of the retailers knowingly made various other false statements in labeling their milk cartons. For example, several of the cartons featured depictions of pastoral scenes with cows grazing in pastures, and advertised the idyllic conditions under which the dairy cows lived. Aurora advertised, "As producers of organic milk, our motto is 'Cows First,'" and, "We believe that animal welfare and cow comfort are the most important measures in organic dairy." (Emphasis omitted.) Wal-Mart represented its milk was produced without the use of antibiotics or pesticides, and organic farmers are committed to the humane treatment of animals. Safeway asserted its dairy cows "enjoy a healthy mix of fresh air, plenty of exercise, clean drinking water and a wholesome, 100% certified organic diet." Target declared, "Our milk comes from healthy cows that graze in organic pastures and eat wholesome organic feed." The class plaintiffs allege these representations are false.

The class plaintiffs also allege false advertising other than the milk cartons themselves. For example, Costco included an article in its *Costco Connection* magazine, which stated, in part:

> When I was asked by Costco to learn about organic products, one question I had was "What makes organic milk so special?" To answer this, I visited one of the farms that produced Costco's Kirkland Signature organic milk.
>
> The cows on the farm have quite the life. They feed on a balanced organic vegan diet and have access to organic pastures for grazing.

On October 17, 2008, appellees filed a joint motion to strike the CCC and three separate (Aurora, retailers, and QAI) motions to dismiss the case, each attacking the CCC. On December 8, 2008, the class plaintiffs moved for leave to amend the CCC. On June 3, 2009, the district court granted appellees' motions to dismiss and denied the motions to strike and to amend the CCC as moot, entering judgment the same day. The class plaintiffs appeal the district court's grant of the motions to dismiss. This court has jurisdiction over the district court's final judgment pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION
### A. Standard of Review

We review de novo a district court's grant of a motion to dismiss for failure to state a claim. See Blankenship v. USA Truck, Inc., 601 F.3d 852, 853 (8th Cir. 2010). "Under Federal Rule of Civil Procedure 12(b)(6), we accept [the class plaintiffs'] factual allegations as true and grant every reasonable inference in [the class plaintiffs'] favor." MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc., 364 F.3d 908, 909 (8th Cir. 2004). "Dismissal is proper when the . . . complaint fails to state a claim upon which relief can be granted." Hawks v. J.P. Morgan Chase Bank, 591 F.3d 1043, 1049 (8th Cir. 2010) (quoting Northstar Indus., Inc. v. Merrill Lynch & Co., 576 F.3d 827, 831-32 (8th Cir. 2009)). "Dismissal is not proper when 'the factual allegations in a

-16-

complaint, assumed true . . . suffice to state a claim to relief that is plausible on its face.'" Id. (quoting Northstar Indus., 576 F.3d at 832). In order to survive a motion to dismiss, the class plaintiffs must "nudge[] [their] claims across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

### B.     Claims Under Review

At the outset, we must confront the question of which complaint is under review in this appeal. As noted above, this multi-district litigation (MDL) case consists of nineteen class action cases, each of which began with its own complaint and case number. The district court ordered the class plaintiffs' lead counsel to file a consolidated complaint. On July 18, 2008, the class plaintiffs filed the CCC. On October 17, 2008, the appellees moved to strike the CCC, arguing the CCC included new claims and otherwise materially amended the complaints in the underlying cases, rather than simply consolidating them as ordered. That same day, Aurora, the retailers, and QAI each separately moved to dismiss the case, attacking the allegations in the CCC. The class plaintiffs later moved for leave to amend the CCC on December 8, 2008.

The district court granted Aurora's, the retailers', and QAI's motions to dismiss and denied the motions to strike and to amend the CCC "as moot." The district court stated:

> Because the Court finds that the basis for all of [the class p]laintiffs' claims is preempted, the Court will not address [the motions to strike and to amend]. The Court lists these causes of action from the [CCC], because it is the Complaint to which the Motions to Dismiss are directed. This does not indicate that [the class p]laintiffs' alteration of the claims and parties in this action have been approved or accepted by the Court.

Aurora and the retailers argue the CCC is therefore not "operative" and the nineteen original class action complaints in the underlying cases are the only complaints properly before this court.

-17-

In effect, Aurora and the retailers ask this court to resolve their motion to strike and the class plaintiffs' motion to amend before reviewing the district court's judgment.[2] The district court explicitly granted the motions to dismiss at issue in this appeal based on the allegations in the CCC, not the complaints in the underlying actions. The district court may not have approved or accepted the CCC, but it did base its rulings for the motions to dismiss on the CCC. And it is those rulings that are before us today. Because the district court ruled on the motions to dismiss based upon the CCC, and because the motions to strike and to amend were denied as moot and no party appealed those denials, the only complaint relevant to this appeal is the CCC. "[I]t has long been the general rule 'that a federal appellate court does not consider an issue not passed upon below.'" Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1037 (8th Cir. 2005) (quoting Singleton v. Wulff, 428 U.S. 106, 120 (1976)). We see no reason to create an exception to this rule where, as here, any prejudice to the appellees was caused by their own failure to file an appeal.

### C.    Preemption

The district court dismissed all the class plaintiffs' claims, which arise under state law, as preempted by the OFPA. The general law of preemption is grounded in the Constitution's command that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "Thus state law that conflicts with federal law has no effect." Jones v. Vilsack, 272 F.3d 1030, 1033 (8th Cir. 2001) (citing Maryland v. Louisiana, 451 U.S. 725, 746 (1981)).

Whether a particular federal statute preempts state law depends upon congressional purpose. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-86 (1996). In

---

[2]The retailers fault the class plaintiffs for not appealing the district court's denial of their motion to amend the CCC, but the retailers did not appeal the district court's denial of their motion to strike. Neither issue is therefore properly before this court. "What is sauce for the goose is sauce for the gander." United States v. Vasquez-Garcia, 449 F.3d 870, 873 (8th Cir. 2006).

interpreting the presence and scope of preemption, courts entertain two presumptions. First,

> Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has "legislated . . . in a field which the States have traditionally occupied," we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

Id. (citations omitted). Second, congressional purpose is "the ultimate touchstone" in every preemption case. Id. Preemptive intent may be indicated "through a statute's express language or through its structure and purpose." Altria Group, Inc. v. Good, 555 U.S. ___, 129 S. Ct. 538, 543 (2008). A state law is expressly preempted when a federal statute states the congressional intention to preempt state law by defining the scope of preemption. See Pet Quarters, Inc. v. Depository Trust & Clearing Corp., 559 F.3d 772, 780 (8th Cir. 2009).

> Implied preemption exists where a federal statutory or regulatory scheme is so pervasive in scope that it occupies the field, leaving no room for state action—this is termed field preemption. Implied preemption also occurs where state law has not been completely displaced but is superseded to the extent that it conflicts with federal law—this is known as conflict preemption.

Id. (internal citations omitted). In determining the congressional intent behind a statute, courts may consider the statute itself and any regulations enacted pursuant to the statute's authority. See U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 765 (1989). Because of the tension between the presumption against preemption and the possibility of implied preemption, "[i]t is often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory measures has left the police power of the States undisturbed except as the

state and federal regulations collide." <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230-31 (1947) (citations omitted).

### 1.    Express Preemption

Aurora briefly argues the OFPA expressly preempts the class plaintiffs' claims in this case.  Express preemption exists where Congress uses "explicit pre-emptive language" to express its purpose.  <u>Gade v. Nat'l Solid Wastes Mgmt. Ass'n</u>, 505 U.S. 88, 98 (1992) (plurality opinion).  Congress expressly preempted independent state certification laws in the OFPA.  <u>See</u> 7 U.S.C. § 6507 (providing for potentially more restrictive state organic certification regulations, but only with USDA approval).  Congress did ***not*** expressly preempt state tort claims, consumer protection statutes, or common law claims.  Aurora fails to support its argument with citation to any language in the statute or regulations which could show Congress's intent to preempt the claims at issue here.  The district court correctly recognized express preemption does not bar any of the class plaintiffs' claims.

For their part, the class plaintiffs and amici The Humane Society of the United States argue, because the OFPA contains express preemptive language which does not address state law claims, the class plaintiffs' claims are not preempted.  It is well settled that a "pre-emption provision, by itself, does not foreclose (through negative implication) 'any possibility of implied . . . pre-emption.'"  <u>Geier v. Am. Honda Motor Co.</u>, 529 U.S. 861, 869 (2000) (quoting <u>Freightliner Corp. v. Myrick</u>, 514 U.S. 280, 288 (1995)).  The existence of a limited preemption provision at least shows Congress considered preemption in its drafting of the law.  We therefore find the OFPA's inclusion of a limited preemption provision, 7 U.S.C. § 6507, while not foreclosing any possibility of implied preemption, is relevant to and is a factor in deciding whether Congress impliedly intended to preempt state law.  <u>See</u> <u>Freightliner Corp.</u>, 514 U.S. at 289 (explaining while a preemption provision does not categorically foreclose the possibility of implied preemption, it may "support[] an inference that an express pre-emption clause forecloses implied pre-emption").

## 2. Field Preemption

Field preemption exists "where the scheme of federal regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" Gade, 505 U.S. at 98 (plurality opinion). The district court found the OFPA statutory scheme similar to the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 651 et seq., at issue in Gade, because "the only way a State may regulate an OSHA-regulated occupational safety and health issue is pursuant to an approved state plan." Gade, 505 U.S. at 99 (plurality opinion) (quoting Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 152-53 (1982)). Because of the OFPA's supposed likeness to OSHA, the district court concluded "it is clear that the area in which state regulation is permitted is narrow."

The OFPA bears minimal resemblance to OSHA. Although both statutes require agency approval of state regulation in their respective fields, the scope of the fields are dissimilar. OSHA requires states to submit plans to the agency if the state "wishes to 'assume responsibility' for 'development and enforcement . . . of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated.'" Id. The OFPA, on the other hand, requires states to seek approval from the USDA only if the State wishes to operate an organic certification program. See 7 U.S.C. § 6507. OSHA's scope is more imposing than OFPA's. The contrast between the scope of the two statutes is even sharper when viewed in light of their purposes. While OSHA contemplates "a comprehensive regulatory scheme designed 'to assure so far as possible . . . safe and healthful working conditions' for 'every working man and woman in the Nation,'" Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 147 (1991) (quoting 29 U.S.C. § 651(b)), the OFPA more modestly contemplates a certification program designed to effect national standards and to eliminate the preexisting "havoc for the industry" caused by balkanized state regulations, see S. Rep. 101-357 (reprinted in 1990 U.S.C.C.A.N. 4656, 4943).

By "agree[ing] with [appellees] that [the class p]laintiffs' claims are barred by the doctrine of field preemption," the district court necessarily assumes nothing more can be done to regulate the organic foods industry than the administration of a certification program. As noted above, in analyzing claims of preemption, courts are to "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," "particularly in those [cases] in which Congress has 'legislated . . . in a field which the States have traditionally occupied." Medtronic, 518 U.S. at 485-86. "Consumer protection is quintessentially a 'field which the States have traditionally occupied.'" Watters v. Wachovia Bank, N.A., 550 U.S. 1, 35-36 (2007) (Stevens, J., dissenting), see also Gen. Motors Corp. v. Abrams, 897 F.2d 34, 41-42 (2d Cir. 1990) ("[C]onsumer protection law is a field traditionally regulated by the states."). In view of the OFPA's text and purpose, the narrowness of its express preemption provision, the presumption against preemption and the tradition of state regulation, we conclude the OFPA's regulatory scheme is not "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."

### 3.    Conflict Preemption

The district court also held conflict preemption bars the class plaintiffs' claims. "Conflict preemption exists where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives." Pet Quarters, 559 F.3d at 780. As noted above, "[t]here is a presumption against preemption in areas of traditional state regulation," Wuebker v. Wilbur-Ellis Co., 418 F.3d 883, 887 (8th Cir. 2005) (citing Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141, 151 (2001)), which "is overcome if it was the 'clear and manifest purpose of [the agency]' to supersede state authority," Id. (quoting Rice, 331 U.S. at 230).

The district court dismissed the class plaintiffs' claims because

> [i]f [they] were permitted to proceed, . . . Aurora's certifications, valid under federal law, would nevertheless be subject to challenge under the statutes and common laws of all fifty states. Any claimant merely suspecting that part of a producer's operation was in any way out of organic compliance, or motivated to interfere with a compliant certified operation, could bring lawsuits such as this. Permitting such suits would pose a clear "obstacle to the accomplishment of congressional objectives." [Pet Quarters, 559 F.3d at 780.]

When Congress enacted the OFPA, one of its objectives was to replace the patchwork of existing state regulations with a national standard defining organic food.[3] State law that poses an obstacle to the establishment of the national standard should therefore be preempted. To carry out its objectives, Congress established a statutory certification scheme and authorized the USDA to propose regulations to carry it out. See § 6521(a). The OFPA also created the National Organic Standards Board, which assists "in the development of standards for substances to be used in organic production and to advise the Secretary [of Agriculture]," see § 6518, and granted the USDA authority to accredit certifying agents to certify farms and handling operations, see § 6514. QAI is one such accredited certifying agent.

---

[3]It is the purpose of this chapter –

**(1)** to establish national standards governing the marketing of certain agricultural products as organically produced products;

**(2)** to assure consumers that organically produced products meet a consistent standard; and

**(3)** to facilitate interstate commerce in fresh and processed food that is organically produced.

7 U.S.C. § 6501.

### a. All Claims Against QAI are Preempted

QAI certified Aurora as an organic supplier and never suspended or revoked the certification.[4] Aurora's certification allows it to sell or label products using the OFPA Terms without penalty. See § 6519(a). The penalty for knowingly selling or labeling a product as organic without certification is $10,000. Id. The decision to certify rests with the certification agent, and the OFPA sets forth an administrative procedure for appeals of the certification agent's decisions. See § 6520(a).

Even a cursory review of the OFPA reveals the nationalization of the decision to certify businesses in order to carry out the statute's purposes. The method the OFPA uses to achieve its purpose is to allow some producers of agricultural products (those that comply with all the requirements set forth in the OFPA and NOP) to sell and label their goods as organic and to prohibit others from doing so. The OFPA achieves this objective by certifying agricultural operations to use the OFPA Terms to sell or label their products. The certifying agents decide whether to certify a particular business—whether they may or may not sell or label their products as organic.

The district court correctly decided, to the extent state law permits outside parties, including consumers, to interfere with or second guess the certification process, the state law is an "obstacle to the accomplishment of congressional objectives" of the OFPA. This court's decision in Pet Quarters is in accord. See Pet Quarters, 559 F.3d at 780 ("Accordingly, any of Pet Quarters's state law claims that challenge the existence or operation of the program or its rules are federally preempted.").

The district court dismissed the class plaintiffs' claims against QAI because the claims "directly contradict the OFPA and NOP." After reviewing the claims against

---

[4]Whether there was a suspension or revocation was disputed in the district court, but Aurora apparently abandoned the argument on appeal. In any event, the court can take notice of the official certifying document.

QAI, the district court reasoned "[e]ssentially, Plaintiffs are asserting that . . . QAI should have revoked . . . Aurora's certifications." A review of each of the counts reveals all the claims against QAI challenge conduct the OFPA and NOP contemplated QAI would undertake in executing its responsibilities pursuant to the statute. As the district court analyzed in detail, it would be impossible, on the one hand, for QAI to comply with the OFPA and its regulations, which detail the process for revoking certifications, and, on the other hand, to comply with any additional state law duty and process to revoke certifications.

The class plaintiffs argue Congress's inclusion of a provision in the OFPA stating that certifying agents must "agree to hold the [USDA] harmless for any failure on the part of the certifying agent to carry out the provisions of this chapter" amounts to a recognition that subjecting certifying agents like QAI to liability does not conflict with the purposes of the OFPA. See 7 U.S.C. § 6515(e)(1). Section 6515 sets forth various requirements necessary for accreditation as a certifying agent, including, among other things, the ability to implement the requirements, employment of sufficient inspectors, and rules regarding record keeping and access, confidentiality, and conflicts. See generally § 6515. One of those requirements is the hold harmless provision. Under § 6515(e)(1), QAI is required to hold the USDA harmless from *all* claims arising out of QAI's failure to carry out the program. The most likely claims to be brought against a certifying agent (at least from the perspective of Congress) probably were not consumer claims such as those at issue here, but claims arising from denials of certification to agricultural businesses. Not surprisingly, § 6515(e)(2) requires agents to "furnish reasonable security . . . for the purpose of protecting the rights of participants in the applicable organic certification program . . . ." While § 6515(e) may be *effective*, vis-à-vis QAI, against an otherwise successful consumer protection claim against the USDA, the *intent* of the provision was not to create, and does not support an argument for, authorizing such a claim against QAI.

Lastly, the class plaintiffs suggest QAI misled the organic milk consuming public when it allowed its "mark of excellence" seal to be affixed to Aurora's milk. But the "mark of excellence" is nothing more than a mark identifying QAI as the certifying agent, which generally is required pursuant to 7 C.F.R. § 205.303(b)(2) ("Agricultural products . . . must . . . identify the name of the certifying agent that certified the handler of the finished product and may display the business address, Internet address, or telephone number of the certifying agent in such label."), and specifically allowed by § 205.303(a)(5) ("Agricultural products . . . may display . . . [t]he seal, logo, or other identifying mark of the certifying agent which certified the production or handling operation producing the finished product."). This argument has no merit.

Because all of the class plaintiffs' claims against QAI stand in conflict with the OFPA, we affirm QAI's dismissal as a party to this lawsuit.

### b. Claims Attacking Aurora's Certification are Preempted

For similar reasons, the class plaintiffs' claims that Aurora and the retailers sold milk as organic when in fact it was not organic are preempted because they conflict with the OFPA. "Even where concurrent regulation is not totally precluded . . . state and local enactments are nullified to the extent that they actually conflict with federal law." ENSCO, Inc. v. Dumas, 807 F.2d 743, 745 (8th Cir. 1986). The class plaintiffs argue the defendants must be both certified and compliant with the underlying requirements in order to comply with the OFPA. Viewed in light of the OFPA's structure and purpose, compliance and certification cannot be separate requirements. Compliance with the regulations may lead to certification, and failure to comply with the regulations may lead to nonapproval, suspension, or revocation of certification, see 7 C.F.R. §§ 205.405, 205.660, but compliance with the regulations is not a separate requirement independently enforceable via state law.

In arriving at this conclusion, we need look no further than the purposes articulated in the OFPA itself. The first purpose, "to establish national standards governing the marketing of certain agricultural products as organically produced products," would be deeply undermined by the inevitable divergence in applicable state laws as numerous court systems adopt possibly conflicting interpretations of the same provisions of the OFPA and NOP. See § 6501(1). While the addition of state enforcement mechanisms may assist in "assur[ing] consumers that organically produced products meet a consistent standard," any added assurance comes at the cost of the diminution of consistent standards, as not only different legal interpretations, but also different enforcement strategies and priorities could further fragment the uniform requirements. See id. at (2). The natural result of these differences in interpretation and enforcement would be an increase in the "consumer confusion and troubled interstate commerce," S. Rep. 101-357, that characterized the period before the OFPA, which stands in direct conflict to the OFPA's third purpose of "facilitat[ing] interstate commerce in fresh and processed food that is organically produced," § 6501(3).

The structure of the OFPA, and particularly its remedial scheme, also support our conclusion that to the extent state laws challenge Aurora's certification they are preempted. Title 7, United States Code, Section 6505(a)(1)(A), specifically allows "a person [to] sell or label an agricultural product as organically produced . . . if such product is produced and handled in accordance" with the OFPA and NOP. The only penalty for noncompliance with the OFPA subjects persons "who knowingly sell[] or label[] a product as organic" to a civil penalty of up to $10,000. § 6519(a). The role of the certifying agent is to "certify a farm or handling operation that meets the requirements of" the OFPA. § 6503(d). As noted above, Aurora maintained its certification at all times relevant to this appeal. Therefore, any attempt to hold Aurora or the retailers liable under state law based upon its products supposedly not being organic directly conflicts with the role of the certifying agent as set forth in § 6503(d). To the extent the class plaintiffs, relying on state consumer protection or tort law, seek to set aside Aurora's certification, or seek damages from any party for Aurora's milk

-27-

being labeled as organic in accordance with the certification, we hold that state law conflicts with federal law and should be preempted. Accordingly, we affirm the district court's dismissal of the class plaintiffs' claims based upon Aurora's and the retailers' marketing, representing, and selling milk as organic when, allegedly, it was not.

### c.     Claims Not Interfering with Aurora's Certification are Not Preempted

It is important to distinguish between state law challenges to the certification determination itself, which conflict with the OFPA, and state law challenges to the facts underlying certification. Aurora correctly points out "certification allows the producer or handler to market, label and sell its products *as organic* unless and until those certifications are subsequently suspended or revoked by the USDA or its certifying agents" (emphasis added). But in contrast to state law challenges to certification itself, challenges to the underlying facts do not necessarily conflict with the OFPA's purposes.

Aurora and the retailers[5] advance the argument that if OFPA certification is to mean anything, it must mean the certified products have met all the requirements included in the OFPA and NOP. They contend, because the class plaintiffs' claims are based upon allegations that Aurora, despite its certification, knowingly failed to

---

[5]There is no reason preemption should be broader for the retailers than it is for Aurora. It is true the retailers are specifically exempt from the OFPA; it is Aurora's responsibility to maintain conditions supporting its certification; the retailers may have had a right to rely upon Aurora's certification; and the OFPA assigns the retailers no duty to investigate whether Aurora was complying with the regulations. However, these are facts related to the degree of fault and the defenses the retailers may pursue under the various state law claims. Because the class plaintiffs' claims do not arise under the OFPA, the extent to which the retailers have fewer duties than Aurora under the statute suggests federal preemption is less, not more, applicable to the retailers than to Aurora.

comply with provisions of the OFPA and NOP upon which certification is based, those claims must be dismissed, because certification means that Aurora complied with the statute and regulations.[6] This is an attractive argument, but its beauty is only skin deep.

Our task is not to determine what certification means, but rather whether Congress intended for the OFPA to preempt state law when the claims rely on proof of facts that, if found by the certification agent, would preclude certification. For example, one requirement for certification is that "producer[s] must establish and maintain preventive livestock health care practices, including . . . [p]rovision of a feed ration sufficient to meet nutritional requirements, including vitamins, minerals, protein and/or amino acids, fatty acids, energy sources, and fiber (ruminants)." 7 C.F.R. § 205.238(a)(2). We believe, in enacting the OFPA, Congress did not intend for requirements such as this to preclude a State from prosecuting a certified organic producer for violating the State's animal cruelty statute by abusing its livestock. Certification relies upon inspection and observation of only a portion of a producer's operations, and thus, the evidence which supported certification could, and very likely would, be different from the evidence which supports a state cause of action.

We begin our analysis by again noting "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress" and that "the purpose of Congress is 'the ultimate touchstone' in every preemption case." Medtronic, 518 U.S. at 485. As discussed above, the argument for broad preemption of state consumer protection, fraud, and tort

---

[6]The retailers cite 7 C.F.R. §§ 205.2 and 205.303 for the proposition that "regulations extend to 'any labeling or market information concerning the product' as well as 'all written, printed or graphic material' that 'accompanies' or is 'about' an organic product." This statement is misleading. The regulations refer to where the terms "organic," "USDA organic," and "made with organic ingredients" may be placed. These regulations do not purport to regulate anything else that appears on the packaging.

claims finds no support in the OFPA's express preemption provision.  See 7 U.S.C. § 6507.

Nor can support for this broad factual preemption view be found in the OFPA or NOP's structure.  The NOP allows many of its requirements to be satisfied in alternative ways.  For example, the requirement that farm producers manage crop nutrients and soil fertility through, among other things, the application of plant and animal materials may be met through the application of some kinds of raw animal manure, composted plant and animal materials, or uncomposted plant materials.  See 7 C.F.R. 205.203(b), (c).  Although not dispositive, this use of the disjunctive tends to show Congress expected the requirements for certification could be met in various ways, which implies Congress lacked intent to give preclusive effect to any particular determination.  Indeed, "the OFPA contemplates that there will be a National List through which non-organic substances can be approved for use in organic products." Harvey v. Johanns, 494 F.3d 237, 238 (1st Cir. 2007) (citing 7 U.S.C. § 6517).

The purposes of the OFPA are not furthered by preempting state law claims like those at issue here.  Preempting state law claims unrelated to the decision to certify, and certification compliance, does not advance the purpose of establishing national standards for organic foods.  Nor does preemption of the facts underlying certification advance the goals of assuring consumers that organics meet a consistent standard, or in facilitating interstate commerce in organics.  To the contrary, preemption of state consumer protection law may actually diminish consumer confidence that organic products meet consistent standards as consumers become aware that otherwise meritorious claims are being preempted because the certifying agent has not suspended the certification in spite of clear facts to the contrary.  Similarly, although broad factual preemption may increase organic production in the short term, consumers may well elect to avoid paying the premium for organic products upon realizing preemption grants organic producers a de facto license to violate state fraud, consumer protection, and false advertising laws with relative impunity, because the OFPA's only remedy for

noncompliance is recourse to the USDA for revocation of certification and possibly for a civil penalty. See 7 U.S.C. § 6519. We do not believe the OFPA's purpose is advanced by extending preemption this far.

The resolution of whether the class plaintiffs' individual claims interfere with the OFPA's certification, as discussed above, is a matter which should best be resolved in the first instance by the district court. This is so because our conclusion that some of the class plaintiffs' claims should not have been dismissed renders Aurora and the retailers' motion to strike the CCC and the class plaintiffs' motion to amend the CCC no longer moot. We do not wish to interfere with the district court's discretionary determination as to how the motions should be resolved, and we are unable to engage in a meaningful review of the class plaintiffs' claims until they are. In the interests of efficiency and justice, we must first determine whether any of the parties dismissed by the district court are entitled to have that dismissal affirmed based upon the principles articulated above. Therefore, if a single claim against each defendant could have survived dismissal we will reverse and remand as to that defendant.

## D. Remand is Appropriate as to Aurora and the Retailers

Except for QAI, at least one claim against each defendant in the CCC could survive preemption. Many of the claims against Aurora seek to hold it accountable for representing its products as organic when in fact the products were not. As discussed above, all of these claims are preempted by the OFPA. However, claims against Aurora for other conduct, particularly other representations it made in marketing its High Meadow brand milk, fall outside the scope of preemption. For example, the class plaintiffs allege Aurora engaged in various deceptive trade practices in violation of the Colorado Consumer Protection Act (CCPA), Colo. Rev. Stat. § 6-1-105(1).

Among other things, the CCPA defines deceptive trade practices to include "advertis[ing] goods . . . with the intent not to sell them as advertised" and "[f]ail[ing] to disclose material information concerning goods . . . which information

was known at the time of an advertisement or sale if such failure . . . was intended to induce the consumer to enter into a transaction." Id. at (i), (u). The class plaintiffs allege Aurora engaged in deceptive advertising practices by, among other things, "misrepresenting the manner in which its dairy cows were raised and fed," and "suppressing or omitting material facts regarding the production of its 'organic' milk or milk products, specifically that . . . the dairy cows were not raised at pasture." This claim sufficiently states a cause of action at this stage of the proceedings. The district court's dismissal of defendant Aurora from the lawsuit must be reversed.

The analysis of the deceptive advertising claims against Costco, Safeway, Target, and Wild Oats is identical to the analysis of the claims against Aurora. Each defendant is alleged to have misrepresented the manner in which the dairy cows were raised and fed in violation of various state deceptive trade practices laws and is alleged to have suppressed or omitted material facts regarding the production of its products. We hold at least one claim could have survived a motion to dismiss as to each of these defendants, again at this stage of the case.

The class plaintiffs accuse Wal-Mart of the same activity as the other retailers. Wal-Mart allegedly advertises that its milk is antibiotic and hormone free. The class plaintiffs also allege Wal-Mart made knowing false statements on its packaging about the humane treatment of cows. There is evidence some of the organic cows at Aurora were put in herds with ordinary cows, potentially subjecting them to injections of antibiotics and hormones. Our review of the allegations against Wal-Mart confirms the allegations are sufficient to state at least one plausible claim for relief, at this stage.

### E.      Instructions on Remand

On remand, the district court should first consider Aurora's and the retailers' motions to strike and the class plaintiffs' motion to amend the CCC. Having determined which claims are properly before it, the court should next consider which of the class plaintiffs' claims survive preemption in accordance with this opinion.

## III.   CONCLUSION

For the foregoing reasons, we (1) affirm the dismissal of defendant QAI from this lawsuit, (2) affirm the dismissal of those claims challenging Aurora's certification and appellees' use of the OFPA Terms, (3) reverse the dismissal of all remaining claims against Aurora, Costco, Safeway, Target, Wild Oats, and Wal-Mart, and (4) remand for further proceedings consistent with this opinion.  Although this task may be difficult in application, we are confident the district court and the parties will be able to apply these holdings.

_____